Slip Op. 18-142

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **MIDWEST FASTENER CORP.,** | |
| **Plaintiff,** | |
| **v.** | |
| **UNITED STATES,** | **Before: Claire R. Kelly, Judge** |
| **Defendant,** | **Court No. 17-00231** |
| **and** | |
| **MID CONTINENT STEEL & WIRE, INC.,** | |
| **Defendant-Intervenor.** | |

### OPINION AND ORDER

[Remanding the U.S. Department of Commerce's final scope determination.]

Dated: October 19, 2018

Robert Kevin Williams, Clark Hill PLC, of Chicago, IL, argued for plaintiff, Midwest Fastener Corp. With him on the brief were Lara A. Austrins and Mark Rett Ludwikowski.

Sosun Bae, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With her on the brief were Patricia M. McCarthy, Assistant Director, Jeanne E. Davidson, Director, and Chad A. Readler, Acting Assistant Attorney General. Of Counsel on the brief was Jessica Rose DiPietro, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Adam Henry Gordon, The Bristol Group PLLC, of Washington, DC, argued for defendant-intervenor, Mid Continent Steel & Wire, Inc. With him on the brief was Ping Gong.

Kelly, Judge:   This action is before the court on Midwest Fastener Corp.'s

("Midwest" or "Plaintiff") USCIT Rule 56.2 motion for judgment on the agency record

challenging the U.S. Department of Commerce's ("Commerce") determination that

Plaintiff's strike pin anchors are subject to the antidumping duty ("ADD") order covering certain steel nails from the People's Republic of China ("PRC").  See Pl.' [Midwest]'s Rule 56.2 Mot. J. Agency R., Jan. 26, 2018, ECF No. 26; Mem. Law Supp. Pl.'s Rule 56.2 Mot. J. Agency R., Jan. 26, 2018, ECF No. 26 ("Pl.'s Br."); see also [ADD] Order on Certain Steel Nails from the [PRC]: Final Ruling on Midwest Fastener Strike Pin Anchors, (Aug. 2, 2017), ECF No. 21-3 ("Final Scope Ruling"); Certain Steel Nails from the [PRC], 73 Fed. Reg. 44,961 (Dep't Commerce Aug. 1, 2008) (notice of [ADD] order) ("PRC Nails Order").  Additionally, Plaintiff challenges as not in accordance with law and unsupported by substantial evidence Commerce's decision not to initiate a formal scope inquiry pursuant to 19 C.F.R. § 351.225(e) (2017)[1] and as not in accordance with law, what Plaintiff claims is, Commerce's retroactive suspension of liquidation and collection of cash deposits.  See Pl.'s Br. at 18–21.  Midwest, a United States importer of the strike pin anchors at issue here, commenced this action pursuant to section 516A(a)(2)(B)(vi) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(vi) (2012).[2]  See Summons, Sept. 1, 2017, ECF No. 1; Compl., Sept. 1, 2017, ECF No. 7.

For the reasons that follow, the court remands Commerce's final scope determination that Plaintiff's strike pin anchors are subject to the PRC Nails Order.

**BACKGROUND**

On June 8, 2017, Midwest requested Commerce to issue a scope ruling excluding its strike pin anchors from the scope of the PRC Nails Order.  See Midwest Fastener

---

[1] Further citations to the Code of Federal Regulations are to the 2017 edition.

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

Scope Req.: Strike Pin Anchors, PD 19, bar code 3579812-01 (June 8, 2017) ("Pl.'s Scope Ruling Req.").[3]  Midwest's strike pin anchors have four components—a steel pin, a threaded body, a nut and a flat washer.  Id. at 2; Final Scope Ruling at 4–5.  Midwest avers that the pin component is composed of a medium carbon steel, coated in yellow zinc, has a rounded head, and that it is not meant to be removed from the anchor itself. Pl.'s Scope Ruling Req. at 3, Ex. 4 (producing a photograph of the steel pin component). Midwest's product ranges in size from ¼ x 1 ¾ to ¾ x 7 ½.  Id. at 2, Ex. 2 (producing a photograph of the strike pin anchors at their various sizes and dimensions).  The strike pin anchor is used by inserting the anchor body into a pre-drilled hole, tightening the nut component to orient and position the pin component, and then striking the pin component with a hammer.  Final Scope Ruling at 9.  The action of striking the pin component expands the anchor body and results in the fastening of the desired item against the masonry.  Id.  On July 14, 2017, Mid Continent Steel & Wire, Inc. submitted comments in opposition to Plaintiff's scope request.  See generally Opp'n [Comments to Midwest's Scope Ruling Req.], PD 24, bar code 3593422-01 (July 14, 2017).

On August 2, 2017, Commerce issued the final scope ruling.  Commerce explained that Midwest's strike pin anchors are unambiguously covered by the scope of the PRC Nails Order based upon the plain meaning of the order and stated that the sources enumerated in 19 C.F.R. § 351.225(k)(1) likewise support Commerce's scope determination.  See Final Scope Ruling at 10–13.  Accordingly, Commerce determined

---

[3] On October 11, 2017, Defendant submitted an index to the administrative record, which can be found at ECF No. 21-1.  All further citations to administrative record documents in this opinion will be to the number assigned to those documents by Commerce in the administrative record index.

that it did not need to consider the criteria under 19 C.F.R. § 351.225(k)(2) ("(k)(2) analysis"). Id. at 10. Commerce issued instructions, effective as of August 2, 2017, to U.S. Customs and Border Protection ("Customs" or "CBP") to continue to suspend liquidation of Midwest's strike pin anchors subject to the PRC Nails Order. See Liquidation Instructions, PD 29, bar code 3606729-01 (Aug. 11, 2017).

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction over Plaintiff's challenge to Commerce's scope determination pursuant to 19 U.S.C. § 1516a(a)(2)(B)(vi) and 28 U.S.C. § 1581(c) (2012),[4] which grant the court authority to review actions contesting scope determinations that find certain merchandise to be within the class or kind of merchandise described in an antidumping or countervailing duty order. See 19 U.S.C. § 1516a(a)(2)(B)(vi); 28 U.S.C. § 1581(c). The court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

## I. Commerce's Determination that Midwest's Strike Pin Anchors are In Scope of the PRC Nails Order

Plaintiff argues that Commerce's determination that Midwest's strike pin anchors are unambiguously covered by the plain language of the PRC Nails Order is unsupported by substantial evidence. See Pl.'s Br. at 14–17. Defendant argues that Commerce's determination is in accordance with law and supported by substantial evidence because the physical description of Midwest's strike pin anchors unambiguously places them

---

[4] Further citations to Title 28 of the United States Code are to the 2012 edition.

within the scope of the <u>PRC Nails Order</u>.  <u>See</u> Def.'s Resp. Pl.'s Rule 56.2 Mot. J. Agency

R. at 10–15, May 7, 2018, ECF No. 32 ("Def.'s Resp. Br.").  In the alternative, Defendant

contends that even if "there is some ambiguity in the scope language," (k)(1) sources,

such as prior relevant scope determinations, the U.S. International Trade Commission's

("ITC") final material injury determination ("ITC Report"), and the petition to the underlying

investigation all support Commerce's conclusion that strike pin anchors are covered by

the order's scope.  <u>See id.</u> at 15–19.  For the reasons that follow, Commerce's scope

determination is not supported by substantial evidence and is remanded to the agency.

On remand, Commerce should proceed to a (k)(2) analysis, and may reopen the record

if Commerce believes it is necessary, to clarify the scope of the <u>PRC Nails Order</u>.

      The language of an antidumping duty order dictates its scope.  <u>See</u> <u>Duferco Steel,</u>

<u>Inc. v. United States</u>, 296 F.3d 1087, 1097 (Fed. Cir. 2002) (citing <u>Ericsson GE Mobile</u>

<u>Commc'ns, Inc. v. United States</u>, 60 F.3d 778, 782 (Fed Cir. 1995)).   Commerce's

regulations authorize it to issue scope rulings to clarify whether a particular product is

within the scope of an order.   <u>See</u> 19 C.F.R. § 351.225(a).   To determine whether a

product is within the scope of an antidumping order, Commerce looks at the plain

language of that order.  <u>See</u> <u>Duferco</u>, 269 F.3d at 1097.  In addition to the scope language,

Commerce will take into account descriptions of the merchandise contained in: (1) the

petition; (2) the initial investigation; and (3) past determinations by the Commission and

by Commerce, including prior scope determinations (collectively "(k)(1) sources").   19

C.F.R. § 351.225(k)(1); <u>see</u> 19 C.F.R. § 351.225(d).  When the (k)(1) sources are not

dispositive, Commerce will initiate a formal scope inquiry and further consider:

(i)   The physical characteristics of the product;
(ii)  The expectations of the ultimate purchasers;
(iii) The ultimate use of the product;
(iv) The channels of trade in which the product is sold; and
(v)  The manner in which the product is advertised and displayed.

19 C.F.R. § 351.225(k)(2).

Commerce has broad authority "to interpret and clarify its antidumping duty orders." Ericsson GE Mobile, 60 F.3d at 782; see also King Supply Co., LLC v. United States, 674 F.3d 1343, 1348 (Fed. Cir. 2012) (stating that Commerce is entitled to substantial deference with regard to interpretations of its own antidumping orders). However, Commerce may not interpret an order "so as to change the scope of that order, nor can Commerce interpret an order in a manner contrary to its terms." Eckstrom Indus., Inc. v. United States, 254 F.3d 1068, 1072 (Fed. Cir. 2001) (citing Wheatland Tube Co. v. United States, 161 F.3d 1365, 1370 (Fed. Cir. 1998)).  Furthermore, "[s]cope orders may be interpreted as including subject merchandise only if they contain language that specifically includes the subject merchandise or may be reasonably interpreted to include it." Duferco, 296 F.3d at 1089.  Although the petition and the investigation proceedings may aid in Commerce's interpretation of the final order, the order itself "reflects the decision that has been made as to which merchandise is within the final scope of the investigation and is subject to the order." Id. at 1096.

The relevant scope language of the PRC Nails Order provides that

[t]he merchandise covered by this proceeding includes certain steel nails having a shaft length up to 12 inches. . . . Certain steel nails may be of one-piece construction or constructed of two or more pieces. Certain steel nails may be produced from any type of steel, and have a variety of finishes, heads, shanks, point types, shaft lengths and shaft diameters. Finishes include, but are not limited to, coating in vinyl, zinc (galvanized, whether by

electroplating or hot-dipping one or more times), phosphate cement, and paint.

PRC Nails Order, 73 Fed. Reg. at 44,961.

The PRC Nails Order describes the subject merchandise, in relevant part, as "certain steel nails . . . up to 12 inches. . . . constructed of two or more pieces. . . . and [that may] have a variety of finishes, heads, shanks, point types, shaft lengths and shaft diameters." PRC Nails Order, 73 Fed. Reg. at 44,961. Several dictionary definitions aid the court in discerning the plain meaning of "nail." See Nail, The American Heritage Dictionary of the English Language 1198 (3d ed. 1996) (Nail: 2. [a] slim, pointed piece of metal hammered into material as a fastener.); Nail, Webster's Third New International Dictionary 1500 (Philip Babcock Gove, Ph.D. & Merriam-Webster Editorial Staff eds. 1993) (Nail: 2a: a slender and usually pointed and headed fastener designed for impact insertion); Nail, oed.com, available at http://www.oed.com/view/Entry/124844?rskey=SYwb52&result=1&isAdvanced=false#ei d (last visited Oct. 16, 2018) (Nail: II. A small metal spike (and related uses).; 4a: A small metal spike, usually with a sharpened end and a blunt head, which may be driven in to a surface with a hammer or other tool in order to fasten things together, serve as a peg, or (occasionally) to provide purchase, etc.); Nail, Merriam-Webster.com, available at https://www.merriam-webster.com/dictionary/nail (last visited Oct. 16, 2018) (Nail: 2: a slender usually pointed and headed fastener designed to be pounded in).

At issue here, however, are not just nails, but also nails that are "constructed of two or more pieces." Although dictionary definitions can identify the physical characteristics of a nail, none of the definitions consulted by the court identify or define a

nail that is constructed of two or more pieces.  The plain language of the PRC Nails Order

does not define the phrase "nails . . . constructed of two or more pieces."  Further, the

prior scope determinations and the ITC Report that Commerce relies upon, see Final

Scope Ruling at 11–13, do not explain what it means for a product to be a nail constructed

of two or more pieces.[5]

In the final scope determination, Commerce purports to consider the strike pin

anchor as a unitary product, describing

> Midwest Fastener's strike pin anchors [as] consist[ing] of four components:
> a threaded body; a steel pin (i.e., nail); a nut, and a flat washer. The sizes
> of the strike pin anchors range from ¼ x 1 ¾ to ¾ x 7 ½. The pin in the
> anchors is medium carbon steel. The surface of the pin is coated with yellow
> zinc, and the head of the pin is rounded.

---

[5] In the final scope determination, Commerce relies on three prior scope rulings and the underlying ITC determination to support its conclusion that Midwest's strike pin anchors are unambiguously in scope of the PRC Nails Order.  See Final Scope Determination at 5–8, 11–13; Certain Steel Nails from the [PRC]: Prior Scope Rulings Relevant to this Proceedings at Attachs. I, II, III, IV, PD 27, bar code 3603872-01 (Aug. 2, 2017) (providing copies of Certain Steel Nails from the [PRC]: Cobra Anchors Co. Ltd. Final Scope Ruling, A-570-909, (Sept. 19, 2013) ("Cobra"); Antidumping and Countervailing Duty Orders on Certain Steel Nails from the Socialist Republic of Vietnam Final Scope Ruling on OMG, Inc.'s Zinc Anchors, A-552-818/C-522-819, (Feb. 6, 2017) ("OMG"); and Antidumping and Countervailing Duty Orders on Certain Steel Nails from the [PRC]: Final Scope Ruling on Simpson Strong-Tie Company's Anchors, A-570-909, (Mar. 20, 2017) ("Simpson"), and of the ITC determination, Certain Steel Nails from the [PRC], USITC Pub. No. 4022, Inv. No. 731-TA-1114 (July 2008) ("ITC Report")).  Commerce contends that anchor products with a steel pin component are in scope of the PRC Nails Order because the pin is "practically and substantively a steel nail" that completes the fastening function and, if removed, would "render the product unusable[.]" Final Scope Ruling at 11.  Accordingly, Commerce concludes that an anchor is a steel nail with other pieces. Id. These prior rulings, however, all presume, without support or explanation, that the phrase "constructed of two or more pieces" is defined either by the plain language of the order, a (k)(1) source, other than a previously issued ruling by Commerce, or in the OMG, Cobra, and Simpson rulings themselves.  Commerce's reliance on the ITC Report is likewise not helpful because, although the report identifies a masonry anchor as an example of a nail constructed of two or more pieces, it also identifies several other examples of nails constructed of two or more pieces.  See ITC Report at I-9.  The words of the PRC Nails Order, however, do not clarify which of these products the order encompasses.

See Final Scope Ruling 10 (citations omitted).  Commerce then concludes that the product is a nail constructed of two or more pieces because the product's steel pin component is "practically and substantively a steel nail."[6]  See id. at 11 (citation omitted). Therefore, Commerce inquires whether a four-component strike pin anchor is a nail, and concludes that it is, by finding that one of its component parts is a nail.  Implicit in Commerce's analysis is the understanding that the phrase, "nails . . . constructed of two or more pieces" (i) includes multi-component products where one component is a nail, and the other non-nail components aid the functioning of the nail, and (ii) that here, the threaded body, washer and nut components merely aid the functioning of the nail component, i.e., the steel pin.[7]  However, neither the words of the PRC Nails Order nor the (k)(1) sources support the implicit interpretation of "nails . . . constructed of two or more pieces" employed by Commerce.  Further, the implication that the other components of the strike pin anchor merely aid the functioning of the pin is not supported by substantial

---

[6] In response to Midwest's argument that nails typically do not have a hex nut or a washer, Commerce states that Midwest's strike pin anchor has a threaded body and explains that "the scope does not necessarily exclude nails with a 'threaded shank.'"  Final Scope Ruling at 11. Plaintiff argues that the threaded body, i.e., shank or anchor portion of the product is not a screw threaded shank because, unlike a nail with a threaded shank that makes direct contact with the masonry and acts as the fastener, only the top most part of Midwest's product's body is threaded and that portion does not come into direct contact with the masonry.  See Pl.'s Br. at 15.  Neither of these arguments address the meaning of the words of the scope language "[c]ertain steel nails . . . constructed of two or more pieces."  See PRC Nails Order, 79 Fed. Reg. at 44,961.

[7] Defendant argues that the plain language of the PRC Nails Order does not limit what pieces accompany a nail "constructed of two or more pieces."  See Def.'s Resp. Br. at 12.  Defendant-Intervenor similarly contends that nails with "one or more non-nail components ("pieces") affixed or joined to them[]" are within the scope of the order, see Def.-Intervenor's Resp. Br. at 6, May 7, 2018, ECF No. 31, and argues that an alternate reading would read out the phrase "constructed of two or more pieces[]" from the scope order altogether.  Id. at 10.  Defendant and Defendant-Intervenor's arguments depend upon the meaning of the phrase "certain steel nails . . . constructed of two or more pieces[,]" and it is not clear what the scope language means by this phrase.

evidence on this record. See Pl.'s Scope Ruling Req. at 3 (explaining that the threaded body component of a strike pin anchor expands against the sides of the pre-drilled hole it is inserted into to secure the item being fastened to the masonry). Commerce cannot support its determination that the strike pin anchors are nails constructed of two or more pieces, unless it clarifies the ambiguous phrase, "constructed of two or more pieces," and supports any subsequent determination with record evidence.[8] Commerce's final scope determination is therefore unsupported by substantial evidence and is remanded.

## II. Commerce's Liquidation Instructions

Plaintiff challenges Commerce's liquidation instructions as unlawful. See Pl.'s Br. at 19–21. Specifically, Plaintiff argues that relevant legal precedent bars Commerce from suspending liquidation retroactively.[9] See id. (citing AMS Assocs., Inc. v. United States, 737 F.3d 1338, 1343–44 (Fed. Cir. 2013); Sunpreme Inc. v. United States, 40 CIT __,

---

[8] The court is aware of the three recent decisions issued by this Court that opine on the reasonableness of Commerce's interpretation of the same scope language, as applied to products similar to that at issue in this case. See generally Midwest Fastener Corp. v. United States, 42 CIT __, Slip Op. 18-132 (Oct. 1, 2018); Simpson Strong-Tie Co. v. United States, 42 CIT __, Slip Op. 18-123 (Sept. 21, 2018); OMG, Inc. v. United States, 42 CIT __, 321 F. Supp. 3d 1262 (2018). Although this court agrees with the conclusion reached in all three of those cases that the plain meaning of the relevant scope language does not unambiguously include a multi-component anchor system, this court respectfully disagrees with those cases' further finding that the plain language unambiguously excludes anchor products. For the reasons provided above, this court finds that the scope language "nails . . . constructed of two or more pieces" is ambiguous.

[9] In its moving brief, Plaintiff also argues that because antidumping duties on a product can only be assessed at the initiation of a formal scope inquiry, Commerce's retroactive instructions here are unlawful. See Pl.'s Br. at 20. In its reply brief, Plaintiff seems to amend its position and states that it is the date of the scope determination, here August 2, 2017, that governs when antidumping duties are assessed and mark when Commerce can issue instructions to CBP. Pl.'s Reply to Def.'s & Def.-Intervenor's Resps. to Pl.'s Rule 56.2 Mot. J. Agency R. at 7, June 14, 2018, ECF No. 36 ("Pl.'s Reply Br.").

145 F. Supp. 3d 1271 (2016) ("Sunpreme I");[10] United States Steel & Fasteners, Inc. v.

United States, 41 CIT __, 203 F. Supp. 3d 1235, 1252–55 (2017)).  Defendant argues

that Commerce's liquidation instructions are in accordance with both the relevant

regulatory framework and legal precedent, and are reasonable.  See Def.'s Resp. Br. at

21–30.  For the reasons that follow, the court agrees with Defendant.

   The relevant regulatory framework provides that Commerce will continue the

suspension of liquidation on entries already subject to a suspension following any

subsequent inquiry into scope by Commerce.  See 19 C.F.R. § 351.225(*l*)(1)–(3).

Liquidation continues to be suspended following an affirmative preliminary or final scope

determination and will only be lifted on Commerce's instruction to CBP, following either a

preliminary or final scope determination that the product is out of scope.  See 19 C.F.R.

§ 351.225(*l*)(2)–(3).  Accordingly, the relevant regulatory framework does not preclude

Commerce from continuing the suspension of liquidation in a situation like the one before

the court.

   The legal precedent Plaintiff invokes does not preclude Commerce from continuing

to suspend liquidation of entries suspended prior to the initiation of a scope inquiry.  AMS

and Steel & Fasteners are distinguishable.  In AMS, after clarifying the scope of an

unclear order, Commerce attempted to reach back and retroactively suspend liquidation

of entries that were not previously so suspended.  See AMS, 737 F.3d at 1340–41, 1344.

Accordingly, AMS's holding that Commerce may only suspend liquidation and collect

---

[10] This Court's Sunpreme I decision was reversed by the U.S. Court of Appeals for the Federal Circuit.  See Sunpreme Inc. v. United States, 892 F.3d 1186, 1194 (Fed. Cir. 2018).  Plaintiff's moving brief was filed several months prior to reversal and its reply brief was filed on the same date that the Court of Appeals issued its decision.

cash deposits prospectively "on or after the date of the initiation of the scope inquiry[,]" and not retroactively, addresses situations where Commerce had not previously suspended liquidation.  See id. at 1344 (quoting 19 C.F.R. § 351.225(*l*)(2)).  In U.S. Steel & Fasteners, Commerce attempted to retroactively suspend liquidation of entries that were not already suspended.  See U.S. Steel & Fasteners, 41 CIT at __, 203 F. Supp. 3d at 1238, 1240–41.  Here, liquidation of Midwest's pin strike anchors was suspended prior to the filing of the scope inquiry.  See Final Scope Ruling at 13; Compl. at ¶28.  Therefore, Commerce did not retroactively suspended liquidation.  The regulations allow for the continued suspension pending a scope inquiry and AMS is inapplicable.  See 19 C.F.R. § 351.225(*l*).

Plaintiff also relies on Sunpreme I to support its argument that Commerce is acting retroactively in violation of AMS.  See Pl.'s Br. at 19.  However, the U.S. Court of Appeals for the Federal Circuit's ("Court of Appeals") reversal of Sunpreme I eliminates Plaintiff's argument.  See Sunpreme Inc. v. United States, 892 F.3d 1186, 1194 (Fed. Cir. 2018) ("Sunpreme II").  Specifically, the Court of Appeals held that this Court lacked jurisdiction under 28 U.S.C. § 1581(i) to hear a case challenging CBP's determination that certain goods were subject to existing antidumping and countervailing duty orders.  See id. at 1191–92, 1194.  The Court of Appeals held that the remedy available to plaintiff, in response to CBP's determination, was to file a scope inquiry with Commerce seeking the exclusion of the goods from the scope of the orders.  Id. at 1193–94.  If, in its scope determination, Commerce denied the requested exclusion, plaintiff could seek review of that determination pursuant to 28 U.S.C. § 1581(c) in this Court.  Id. at 1193.  The Court of Appeals, therefore, reasoned that because relief was available to plaintiff under another

subsection of the jurisdictional statute, this Court's residual grant of jurisdiction under 28 U.S.C. § 1581(i) was not available.[11]  See Sunpreme II, 892 F.3d at 1193–94.  Implicit in the Court of Appeals' reversal of Sunpreme I was the recognition that Customs did not act ultra vires in determining that certain goods must enter subject to existing orders and that "Customs can suspend liquidation pre-scope inquiry."  Id. at 1194.  Sunpreme I's reliance on AMS stemmed from its holding that CBP had acted ultra vires and the court's conclusion that there was no valid suspension of liquidation in place.  See Sunpreme I, 40 CIT at __, 145 F. Supp. 3d at 1286–89.  Sunpreme I found that because there was no valid suspension of liquidation to continue under 19 C.F.R. § 351.225(l)(2) and (3), CBP acted beyond its authority in ordering the collection of cash deposits on entries entered prior to Commerce initiating a scope inquiry.  Id., 40 CIT at __, 145 F. Supp. 3d at 1286–89, 1295–96.

Sunpreme I cannot help Plaintiff here.[12]  The liquidation of goods at issue here was already suspended and Commerce may, under its regulatory framework, continue the suspension.  Accordingly, although the language of the PRC Nails Order is ambiguous

---

[11] This Court's subject matter jurisdiction is governed by 28 U.S.C. § 1581.  Subsection (i) of the statute is the Court's residual jurisdiction provision that is invoked under specifically enumerated circumstances, and "may not be invoked when jurisdiction under another subsection of § 1581 is or could have been available, unless the remedy provided under that other subsection would be manifestly inadequate."  Int'l Custom Prods., Inc. v. United States, 467 F.3d 1324, 1327 (Fed. Cir. 2006) (quoting Norcal/Crosetti Foods, Inc. v. United States, 963 F.2d 356, 359 (Fed. Cir. 1992)).

[12] In its reply brief, Plaintiff also invokes Sunpreme III, which reviewed a challenge to Commerce's scope determination and addressed the lawfulness of the same liquidation instructions challenged in Sunpreme I.  See Pl.'s Reply Br. at 8 (citing Sunpreme Inc. v. United States, 41 CIT __, 256 F. Supp. 3d 1265 (2017) (Sunpreme III)).  The Sunpreme III decision is not helpful for the same reasons Sunpreme I is not.

Court No. 17-00231                                                          Page 14

and must be clarified through a formal scope inquiry, Commerce's suspension of liquidation is lawful.

**CONCLUSION**

For the foregoing reasons, it is

**ORDERED** that Commerce's final scope determination is remanded for Commerce to conduct a formal scope inquiry and (k)(2) analysis; and it is further

**ORDERED** that Commerce shall file its remand redetermination with the court within 90 days of this date; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have 30 days to file their replies to comments on the remand redetermination.


                                                            /s/ Claire R. Kelly
                                                          Claire R. Kelly, Judge

Dated: October 19, 2018
          New York, New York