Slip Op. 20-28

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| MIDWEST FASTENER CORP., | |
| Plaintiff, | |
| v. | Before: Claire R. Kelly, Judge |
| UNITED STATES, | Court No. 17-00231 |
| Defendant, | |
| and | |
| MID CONTINENT STEEL & WIRE, INC., | |
| Defendant-Intervenor. | |

## OPINION AND ORDER

[Remanding the U.S. Department of Commerce's remand results.]

Dated: March 4, 2020

Robert Kevin Williams and Mark Rett Ludwikowski, Clark Hill PLC, of Chicago, IL, for plaintiff, Midwest Fastener Corp.

Sosun Bae, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. With her on the brief were Patricia M. McCarthy, Assistant Director, Jeanne E. Davidson, Director, and Joseph H. Hunt, Assistant Attorney General. Of Counsel was Vania Y. Wang, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Adam Henry Gordon and Ping Gong, The Bristol Group PLLC, of Washington, DC, for defendant-intervenor, Mid Continent Steel & Wire, Inc.

Kelly, Judge:  Before the court is the U.S. Department of Commerce's

("Commerce") remand  redetermination  filed  pursuant  to  the  court's  order  in

Court No. 17-00231                                                    Page 2

Midwest Fastener Corp. v. United States, 42 CIT __, __, 348 F. Supp. 3d 1297, 1306

(2018) ("Midwest I").  See Final Results of Redetermination Pursuant to Ct. Remand,

Apr. 25, 2019, ECF No. 61 ("Remand Results").

On August 2, 2017, Commerce issued the final scope ruling determining that

Midwest Fastener Corp.'s ("Midwest" or "Plaintiff") strike pin anchors were included

within the scope of the antidumping duty ("ADD") order covering certain steel nails

from the People's Republic of China ("PRC").  See [ADD] Order on Certain Steel Nails

from the [PRC]: Final Ruling on Midwest Fastener Strike Pin Anchors, (Aug. 2, 2017),

ECF No. 21-3 ("Final Scope Ruling"); see also Certain Steel Nails from the [PRC], 73

Fed. Reg. 44,961 (Dep't Commerce Aug. 1, 2008) (notice of [ADD] order) ("PRC Nails

Order").  In Midwest I, the court explained that the phrase "nails . . . constructed of

two or more pieces," as it is used in the PRC Nails Order, is ambiguous and, therefore,

Commerce's conclusion that Midwest's strike pin anchors were in scope was

unsupported by substantial evidence.  Midwest I, 42 CIT at __, 348 F. Supp. 3d at

1300–04, 1306.  As a result, the court ordered Commerce to initiate a formal scope

inquiry and conduct 19 C.F.R. § 351.225(k)(2) (2017)[1] analysis ("(k)(2) analysis") on

remand.  Id. [2]

---

[1] Further citations to the Code of Federal Regulations are to the 2017 edition.

[2] The court, however, sustained Commerce's liquidation instructions, effective as of
August 2, 2017 ("original liquidation instructions") on the basis of the U.S. Court of
Appeals for the Federal Circuit's ("Court of Appeals") implicit recognition in
Sunpreme Inc. v. United States, 892 F.3d 1186, 1194 (Fed. Cir. 2018) ("Ct. Appeals

(footnote continued)

On remand, Commerce continues to assert that the scope language covers Midwest's strike pin anchors.  Remand Results at 7–11.  Commerce also, under respectful protest, conducted a (k)(2) analysis and likewise concludes that Midwest's strike pin anchors are in scope.  Id. at 11–19.  Finally, Commerce states that in light of its determination on remand, it intends to instruct CBP that only the pin component of Midwest's strike pin anchor is dutiable under the PRC Nails Order.

---

Sunpreme 2018") that CBP can lawfully suspend liquidation of an article that it deems to be within the scope of a relevant duty order and that Commerce can issue instructions that CBP continue suspension of liquidation.  Midwest I, 42 CIT at __, 348 F. Supp. 3d at 1304–06.  Subsequently, this court's decision regarding Commerce's liquidation instructions in Midwest I was called into question by Sunpreme Inc. v. United States, 924 F.3d 1198 (Fed. Cir. 2019), rev'd in part on reh'g en banc, 946 F.3d 1300 (Fed. Cir. 2020) ("Ct. Appeals Sunpreme 2019").  Following Ct. Appeals Sunpreme 2019, the court asked parties to file supplemental briefing addressing whether Ct. Appeals Sunpreme 2019 undermined the court's decision in Midwest I to sustain Commerce's original liquidation instructions—and whether the issue should be reconsidered.  See Ct.'s Letter, July 9, 2019, ECF No. 70; see also Midwest I, 42 CIT at __, 348 F. Supp. 3d at 1304–06.  The parties complied.  See Def.'s Resp. Ct.'s Letter, Aug. 1, 2019, ECF No. 72; Pl.'s Resp. Ct.'s Letter, Aug. 9, 2019, ECF No. 75; Pl.'s Reply [Def.'s Suppl. Br.], Aug. 15, 2019, ECF No. 76; [Def.'s] Reply [Pl.'s Suppl. Br.], Aug. 23, 2019, ECF No. 77.

Thereafter, the parties in Ct. Appeals Sunpreme 2019 petitioned the Court of Appeals for rehearing on the matter.  See Combined Pet. for Reh'g & Reh'g En Banc [of Ct. Appeals Sunpreme 2019], [Ct. Appeals] Docket No. 2018-1116 (Fed. Cir. July 29, 2019), ECF No. 80.  This court issued a stay in this proceeding, pending the Court of Appeals's decision on the petition for rehearing in Ct. Appeals Sunpreme 2019.  See Order, Nov. 19, 2019, ECF No. 82.  On January 7, the Court of Appeals rendered its decision in Sunpreme Inc. v. United States, 946 F.3d 1300 (Fed. Cir. 2020) (en banc) ("Ct. Appeals Sunpreme 2020").  The Court vacated its original panel opinion and reversed the portion of this court's decision that relied upon it.  Id.  Ct. Appeals Sunpreme 2020 held CBP acts within its authority when it interprets the scope of an order, and therefore Commerce may order CBP to continue suspending the liquidation of goods entered or withdrawn prior to a formal scope inquiry.  In light of the Court of Appeals's holding in Ct. Appeals Sunpreme 2020, Midwest I's holding regarding liquidation stands.

Court No. 17-00231                                                          Page 4

Remand Results at 25–26.  For the reasons that follow, Commerce's determination

on remand continues to be unsupported by substantial evidence.

## BACKGROUND

The court assumes familiarity with the facts as set forth in the previous

opinion and recounts the facts relevant to the issues currently before the court.  See

Midwest I, 42 CIT at __, 348 F. Supp. 3d at 1299–1300.  On June 8, 2017, Midwest

requested Commerce issue a scope ruling excluding its strike pin anchors from the

scope of the PRC Nails Order.  See Midwest Fastener Scope Req.: Strike Pin Anchors

at 1–2, 4–12, PD 19, bar code 3579812-01 (June 8, 2017) ("Pl.'s Scope Ruling Req."). [3]

Midwest is an importer of the strike pin anchors at issue.  Midwest's strike pin

anchors have four components—a steel pin, a threaded body, a nut and a flat washer. [4]

Pl.'s Scope Ruling Req. at 2; see also Final Scope Ruling at 10; Def.'s Resp. Parties'

Cmts. on [Remand Results] at 3, June 27, 2019, ECF No. 67 ("Def.'s Reply to Cmts.").

Midwest avers that the pin component is not meant to be removed from the anchor

and can only be removed with the aid of a claw hammer or pliers.  Pl.'s Scope Ruling

---

[3] On October 11, 2017, Defendant filed the index to the administrative record underlying Commerce's scope inquiry.  See Administrative Record, Oct. 11, 2017, ECF No. 21-1.  On May 9, 2019, Defendant filed indices to the public and confidential administrative records of the remand proceedings.  See Public/Confidential Remand Record Index, May 9, 2019, ECF No. 62-2–3.  All references to administrative record documents in this opinion will be to the numbers Commerce assigned to the documents in the relevant indices.

[4] Defendant notes that the nut and washer are a one-piece unit.  See Def.'s Reply to Cmts. at 3 (citing to Pl.'s Scope Ruling Req. at 2).  Thus, the strike pin anchors may also be considered comprised of three components.

Court No. 17-00231                                                                                Page 5

Req. at 3; <u>see also</u> Final Scope Ruling at 4; <u>Remand Results</u> at 4; Def.'s Reply to Cmts. at 3.   The strike pin anchor is prepared for use by first drilling a hole through an object, and then drilling another hole into the masonry upon which the object is to be attached.   <u>See</u> Pl.'s Scope Ruling Req. at 3, 9; <u>see also</u> Final Scope Ruling at 4–5; <u>Remand Results</u> at 4; Def.'s Reply to Cmts. at 3.   After the two holes are aligned, the anchor is pushed through the hole in the object and into the hole in the masonry.   <u>See</u> Pl.'s Scope Ruling Req. at 3, 9; <u>see also</u> Final Scope Ruling at 5; <u>Remand Results</u> at 4; Def.'s Reply to Cmts. at 3.   The nut and washer components are then tightened to orient and position the anchor, and the pin component is subsequently struck with a hammer.   <u>See</u> Pl.'s Scope Ruling Req. at 3, 9; <u>see also</u> Final Scope Ruling at 5; <u>Remand Results</u> at 4; Def.'s Reply to Cmts. at 3.   The action of striking the pin component expands the anchor body and results in the fastening of the desired item against the masonry.   <u>See</u> Pl.'s Scope Ruling Req. at 3, 9; <u>see also</u> Final Scope Ruling at 5; <u>Remand Results</u> at 4; Def.'s Reply to Cmts. at 3.

In <u>Midwest I</u>, the court determined that Commerce's conclusion that Midwest's strike pin anchors are within the scope of the <u>PRC Nails Order</u> was unsupported by substantial evidence.   <u>See</u> <u>Midwest I</u>, 42 CIT at __, 348 F. Supp. 3d at 1300–06.   The court examined various dictionary definitions and concluded that although the definitions could identify the physical characteristics of a nail, "none of the definitions consulted by the court identify or define a nail that is constructed of two or more pieces."   <u>Id.</u> at __, 348 F. Supp. 3d at 1302.   The court held that neither the plain language of the <u>PRC Nails Order</u> nor any sources identified under 19 C.F.R. §

Court No. 17-00231                                                                                    Page 6

351.225(k)(1) "explain what it means for a product to be a nail constructed of two or more pieces." Id. at __, 348 F. Supp. 3d at 1302. The court concluded that Commerce could not support its determination that strike pin anchors are nails constructed of two or more pieces, unless it clarifies the ambiguous phrase, "constructed of two or more pieces," and supported any subsequent determination with record evidence. See id. at __, 348 F. Supp. 3d at 1303–04. The Final Scope Ruling was remanded for Commerce to conduct a formal scope inquiry and (k)(2) analysis. See id. at __, 348 F. Supp. 3d at 1306.

On remand, Commerce reopened the administrative record and invited parties to submit new factual information clarifying the PRC Nails Order's phrase "nails . . . constructed of two or more pieces[ ]" and addressing the function of the anchor component in relation to the pin component. See Remand Results at 5–6; see also PRC Nails Order, 73 Fed. Reg. at 44,961; 19 C.F.R. § 351.225(e). Commerce further explicated its view of the scope language by interpreting the phrase "nail . . . constructed of two or more pieces," as nails that match the physical characteristics enumerated in the PRC Nails Order, "plus some additional piece or pieces[,]" not limited by function or material. See Remand Results at 10. Commerce, also, under respectful protest, carried out a (k)(2) analysis, specifically considering the physical characteristics of the goods, the expectations of the ultimate purchasers, the ultimate use of the product, the channels of trade in which the product is sold, and the manner in which the product is advertised and displayed, and restated its view that Midwest's strike pin anchors were in scope. Remand Results at 11–19. Commerce indicated

that it intends to instruct CBP that only the pin component of Midwest's strike pin

anchor is subject to duties under the <u>PRC Nails Order</u>.  <u>See</u> <u>id.</u> at 10–11, 21.

Midwest challenges Commerce's definition of the relevant phrase as "illogical"

and argues that Commerce has not complied with the court's remand order because

the phrase remains ambiguous.  <u>See</u> Pl.'s Cmts. on [Remand Results], May 28, 2019,

ECF No. 64 ("Midwest's Cmts.").  Mid Continent challenges Commerce's proposed

instructions, but supports Commerce's conclusion that under a (k)(2) analysis

Midwest's strike pin anchors are covered by the scope of the <u>PRC Nails Order</u>.  <u>See</u>

Def-Int.'s Cmts. on [Remand Results] at 2–5, May 28, 2019, ECF No. 63 ("Mid

Continent's Cmts.").

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction pursuant to section 516A(a)(2)(B)(vi) of the Tariff

Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(vi) and 28 U.S.C. § 1581(c)

(2012),[5] which grant the court authority to review actions contesting scope

determinations that find certain merchandise to be within the class or kind of

merchandise described in an antidumping or countervailing duty order.  <u>See</u> 19

U.S.C. § 1516a(a)(2)(B)(vi); 28 U.S.C. § 1581(c).  The court will uphold Commerce's

determination unless it is "unsupported by substantial evidence on the record, or

otherwise not in accordance with law . . ." 19 U.S.C. § 1516a(b)(1)(B)(i).  "The results

---

[5] Further citations to the Tariff Act of 1930, as amended, are to the relevant
provisions of Title 19 of the U.S. Code, 2012 edition.  Further citations to Title 28 of
the United States Code are to the 2012 edition.

of a redetermination pursuant to court remand are also reviewed 'for compliance with

the court's remand order.'" <u>Xinjiamei Furniture (Zhangzhou) Co. v. United States</u>,

38 CIT __, __, 968 F. Supp. 2d 1255, 1259 (2014) (quoting <u>Nakornthai Strip Mill</u>

<u>Public Co. v. United States</u>, 32 CIT 1272, 1274, 587 F. Supp. 2d 1303, 1306 (2008)).

## DISCUSSION

Plaintiff argues that Commerce failed to comply with the court's instructions

to clarify the ambiguous phrase "constructed of two or more pieces." <u>See</u> Midwest's

Cmts. at 1–2. Plaintiff further argues that Commerce's (k)(2) analysis is unsupported

by substantial evidence. <u>See</u> <u>id.</u> at 3–5. Defendant responds that Commerce's

remand redetermination is supported by substantial evidence and complies with the

court's remand order. <u>See</u> Def.'s Reply to Cmts. at 6–16. For the reasons that follow,

Commerce's determination that Midwest's strike pin anchors are within the scope of

the <u>PRC Nails Order</u> is unsupported by substantial evidence.

The language of an antidumping duty order dictates its scope. <u>See</u> <u>Duferco</u>

<u>Steel, Inc. v. United States</u>, 296 F.3d 1087, 1097 (Fed. Cir. 2002) (citing <u>Ericsson GE</u>

<u>Mobile Commc'ns, Inc. v. United States</u>, 60 F.3d 778, 782 (Fed. Cir. 1995)).

Commerce's regulations authorize it to issue scope rulings to clarify whether a

particular product is within the scope of an order. <u>See</u> 19 C.F.R. § 351.225(a). To

determine whether a product is within the scope of an antidumping order, Commerce

looks at the plain language of that order. <u>See</u> <u>Duferco</u>, 269 F.3d at 1097. When

considering the scope language, Commerce will take into account descriptions of the

merchandise contained in: (1) the petition; (2) the initial investigation; and (3) past

Court No. 17-00231                                                                 Page 9

determinations by the Commission and by Commerce, including prior scope

determinations (collectively "(k)(1) sources"). 19 C.F.R. § 351.225(k)(1); see 19 C.F.R.

§ 351.225(d). When the (k)(1) sources are not dispositive, Commerce will initiate a

formal scope inquiry and further consider:

> (i)  The physical characteristics of the product;
> (ii) The expectations of the ultimate purchasers;
> (iii)   The ultimate use of the product;
> (iv)    The channels of trade in which the product is sold; and
> (v) The manner in which the product is advertised and displayed.

19 C.F.R. § 351.225(k)(2).

Commerce has broad authority "to interpret and clarify its antidumping duty

orders." Ericsson GE Mobile, 60 F.3d at 782; see also King Supply Co., LLC v. United

States, 674 F.3d 1343, 1348 (Fed. Cir. 2012) (stating that "Commerce is entitled to

substantial deference with regard to its interpretations of its own antidumping

orders."). However, Commerce may not interpret an order "so as to change the scope

of that order, nor can Commerce interpret an order in a manner contrary to its terms."

Eckstrom Indus., Inc. v. United States, 254 F.3d 1068, 1072 (Fed. Cir. 2001) (citing

Wheatland Tube Co. v. United States, 161 F.3d 1365, 1370 (Fed. Cir. 1998)).

Furthermore, "[s]cope orders may be interpreted as including subject merchandise

only if they contain language that specifically includes the subject merchandise or

may be reasonably interpreted to include it." Duferco, 296 F.3d at 1089. Although

the petition and the investigation proceedings may aid in Commerce's interpretation

of the final order, the order itself "reflects the decision that has been made as to which

merchandise is within the final scope of the investigation and is subject to the order."

Id. at 1096.

> The relevant scope language of the <u>PRC Nails Order</u> provides that
>
> [t]he merchandise covered by this proceeding includes certain steel nails having a shaft length up to 12 inches . . . Certain steel nails may be of one piece construction or constructed of two or more pieces. Certain steel nails may be produced from any type of steel, and have a variety of finishes, heads, shanks, point types, shaft lengths and shaft diameters. Finishes include, but are not limited to, coating in vinyl, zinc (galvanized, whether by electroplating or hot-dipping one or more times), phosphate cement, and paint.

<u>PRC Nails Order</u>, 73 Fed. Reg. at 44,961.

Commerce's remand determination that the phrase "nails . . . constructed of two or more pieces" unambiguously includes "a nail which would otherwise satisfy the definition of the scope, were it imported as a stand-alone single-piece nail, plus some additional piece or pieces[,]" <u>Remand Results</u> at 10, is unsupported by the record.  On remand Commerce reopened the record and solicited information from the parties concerning the meaning of the phrase "nails . . . constructed of two or more pieces." <u>See</u> <u>id.</u> at 7.[6]  Midwest submitted "the ASTM Standard Specification for Driven Fasteners: Nails, Spikes, and Staples[,]"  <u>Id.</u> (internal quotations omitted). Commerce did not address this standard in its analysis other than to list the types of

---

[6] In its remand Commerce did not rely upon any new evidence but rather returned to its citation to the ITC report and agreed with the Defendant-Intervenors' understanding of the meaning of nails constructed of two or more pieces as a very general phrase that "encompasses a wide variety of types of nails[.]"  <u>See</u> <u>Remand Results</u> at 8. Commerce contends that record evidence demonstrates that the "additional pieces" are "not limited with respect to materials or function . . . in relation to the product as a whole."  <u>Id.</u>

nails listed in the standard.[7]  Mid Continent did not provide new evidence, id. at 7–

8, though it did offer its own definition in its comments to the agency.  Id. (quoting

Letter from Mid Continent Resp. Scope Remand Req. Information at 3, RPD 6, bar

code 3790351-01 (Feb. 6, 2019) ("Mid Continent's (k)(2) Cmts.")).[8]

    Although Commerce does not discuss any new evidence in the record, it

contends the PRC Nails Order covers a wide variety of nail types. PRC Nails Order,

---

[7] The Remand Results note the following examples given in the ASTM standards:

> Umbrella Head Roofing Nails, which consist of a leak-resistant umbrella
> head atop a steel nail (Table 29); Cap Nail-Hand Driven Roofing Nails,
> which consist of a round or square steel cap atop a steel nail (Table 31);
> Cap Nail Power-Tool Driven Roofing Nails, which consist of a round or
> square steel cap atop a steel nail (Table 32); Washered-Aluminum
> Roofing Nail, which consist of an aluminum roofing nail with a neoprene
> washer (Table 33); and Washered-Steel Roofing Nails, which consist of
> a steel roofing nail with a elastomer washer (Table 34).

Remand Results at 7–8 n. 28 (citing Midwest's Cmts. on Draft Remand Results at Ex.
1, Feb. 6, 2019, RPD 7, bar code 3790475-01 (Feb. 6, 2019)).

[8] Mid Continent identified that:

> A nail of two or more pieces, as the very name indicates, consists of a
> nail with a one or more components or "pieces." The additional
> components are joined, affixed or otherwise combined with the nail. A
> variety of nails are produced and sold in this manner. Some have plastic
> or metal washers affixed underneath the head of the nail. Others, like
> decorative upholstery nails, have a decorative cap attached to the top of
> the head of the nail. Others have a felt washer underneath the head.
> Others have anchors made of steel, zinc, or plastic affixed to the nail.
> The phrase "of two or more pieces" is necessarily general and is used to
> cover all types of such nails.

Mid Continent's (k)(2) Cmts. at 3.

Court No. 17-00231                                                Page 12

73 Fed. Reg. at 44,961.[9]  Commerce points to the phrasing as general and "used to cover all types of such nails," Remand Results at 8, and reasons that nails may therefore have different physical characteristics.  See id. Commerce also notes that the scope language has few exclusions and does not indicate that a "scope nail would be excluded from the scope based on it being constructed with an additional piece or pieces." Id. at 9.  Commerce also asserts that the "record provides numerous examples of nails which could be considered 'nails . . . constructed of two or more pieces[,]'" which could aid in clarifying the phrase at issue.  Remand Results at 9.  Commerce does not provide these examples or a citation to them.  Commerce does not explain how these examples support its interpretation.   Ultimately, Commerce's interpretation posits that any fastener that has a nail incorporated within it is within scope.  See Remand Results at 11. Commerce's clarification of the phrase "nails . . . constructed of two or more pieces" cannot withstand scrutiny.

       First, the actual words of the scope do not support Commerce's interpretation. The scope "includes certain steel nails. . . of one piece construction or constructed of two or more pieces." PRC Nails Order, 73 Fed. Reg. at 44,961.  The use of the phrase "constructed of two or more pieces" signifies a product which itself is a nail, rather than a nail with other parts.  The word "constructed" means something that is built or put together with other parts.  See Construct, The American Heritage Dictionary

---

[9] Referring to language in the PRC Nails Order that in scope are nails up to 12 inches in length, round wire or cut nails, nails produced from any type of steel, nails with a variety of finishes, heads, shanks, point types, shaft lengths, and shaft diameters. PRC Nails Order, 73 Fed. Reg. at 44,961.

of the English Language 404 (3d ed. 1996); <u>Constructed</u>, Webster's Third New International Dictionary 489 (Philip Babcock Gove, Ph.D. & Merriam-Webster Editorial Staff eds. 1993); <u>Construct</u>, oed.com, <u>available at</u> https://www.oed.com/view/Entry/39894?rskey=d9ZITS&result=1&isAdvanced=false #eid (last visited Feb. 28, 2020); <u>Construct</u>, Merriam-Webster.com, <u>available at</u> https://www.merriam-webster.com/dictionary/constructed (last visited Feb. 28, 2020).[10] Commerce's interpretation that such language includes a nail which would otherwise satisfy the definition of the scope, were it imported as a stand-alone single piece, plus some additional piece or pieces, ignores the word "constructed" in the scope language. The nail covered by the scope must be one that is constructed of pieces, not one where a nail is merely part of another object.

Second, Commerce asserts that the record provides numerous examples of nails which could be considered nails constructed of two or more pieces, yet Commerce does not provide those examples, nor any citation to where the court could find those examples. <u>See</u> <u>Remand Results</u> at 9, 12. Commerce does not explain how those examples might support its view other than to say that they do. <u>See</u> <u>Remand Results</u> at 9, 12. Indeed evidence in the record would appear to detract from Commerce's conclusion. The ASTM Standard Specification for Driven Fasteners: Nails, Spikes

---

[10] The American Heritage Dictionary of the English Language defines "construct" as "[t]o form by assembling or combining parts; build"; Webster's Third New International Dictionary defines "construct" as "to form, make, or create by combining parts or elements"; the Oxford English Dictionary defines "construct" as "[t]o make or form by fitting the parts together; to frame, build, erect"; Merriam-Webster defines "construct" as "to make or form by combining or arranging parts or elements[.]"

Court No. 17-00231                                                          Page 14

and Staples provides the standard specifications for a large range of "nails, spikes,

staples and other fasteners[;]" neither an anchor nor a strike pin anchor are among

the variations of nail products that the ASTM recounts.  See Midwest's Cmts. on Draft

Remand Results at 5–7, Feb. 6, 2019, RPD 7, bar code 3790475-01 (Feb. 6, 2019)

("Midwest's (k)(2) Cmts.").  Moreover, the examples of nails given there would seem

to support a narrower interpretation of the phrase than that proffered by Commerce.

Specifically, the ASTM lists:

> Umbrella Head Roofing Nails, which consist of a leak-resistant umbrella
> head atop a steel nail; Cap Nail-Hand Driven Roofing Nails, which
> consist of a round or square steel cap atop a steel nail; Cap Nail Power-
> Tool Driven Roofing Nails, which consist of a round or square steel cap
> atop a steel nail; Washered-Aluminum Roofing Nail, which consist of an
> aluminum roofing nail with a neoprene washer; and Washered-Steel
> Roofing Nails, which consist of a steel roofing nail with a elastomer
> washer

See  Remand Results at 7–8 n. 28 (citing Midwest's (k)(2) Cmts. at Ex. 1)

(parentheticals omitted).  In each, it would appear that the shank or pin component

serves to secure the fastener.  Commerce does not address these examples provided

by the plaintiff. Commerce must address record evidence that detracts from its

conclusion that the strike pin anchors are nails.  See Universal Camera Corp. v.

NLRB, 340 U.S. 474, 488 (1951) (noting that "[t]he substantiality of evidence must

take into account whatever in the record fairly detracts from its weight.").

Commerce, in recommitting to its original position that the scope

unambiguously covers the strike pin anchors, lists key physical characteristics that

Court No. 17-00231                                                              Page 15

"additional pieces"[11] may have, contending that these characteristics exemplify the

wide variety of additional pieces covered by the <u>PRC Nails Order</u>.  <u>Remand Results</u>

at 10, 24–25.  Commerce, however, fails to include a cite where in the record the

characteristics are established.[12]  The court, therefore, cannot assess whether or not

---

[11] Commerce asserts that the "two or more pieces" language from the <u>PRC Nails Order</u> refers to pieces with the following characteristics:

- The additional piece(s) is/are not limited to steel, but may be made of plastic, zinc, rubber, neoprene, or any other material;

- The additional piece(s) is/are not limited to any single part of a nail, including a nail head, but can consist of a cap, washer, an outer-body anchor, or any other piece;

- The additional piece(s) is/are joined, affixed, or otherwise combined with the nail; and

- The additional piece(s) may serve different functions. For example, the piece(s) may be decorative (as is the case with the head of an upholstery nail), be used to seal the nail-hole (as is the case with nails with washers), or assist in the overall function of the product as a whole.

<u>Remand Results</u> at 10.

[12] Commerce references the same "key characteristics" in its (k)(2) analysis and cites the U.S. International Trade Commission's ("ITC") final material injury determination ("ITC Report") as a source from which the characteristics can be reasonably discerned.  <u>See</u> <u>Remand Results</u> at 13–15; <u>see also</u> <u>Certain Steel Nails from the [PRC]</u> at I-9, Inv. No. 731-TA-1114, USITC Pub. No. 4022 (July 2008) <u>available at</u> https://www.usitc.gov/publications/701_731/pub4022.pdf (last visited Feb. 28, 2020) ("ITC Report").  It is not clear to the court, however, whether Commerce, when it interprets the plain language of the <u>PRC Nails Order</u> outside the (k)(2) analysis, is similarly relying on the ITC Report and if it is, which parts of the ITC Report are relevant to its analysis. Given the number of key characteristics Commerce invokes, the voluminous nature of the ITC Report, and Commerce's lack of analysis, the court cannot reasonably discern the basis for Commerce's interpretation.  <u>NMB Sing. Ltd. v. United States</u>, 557 F.3d 1316, 1319–20, 1326 (Fed.

(footnote continued)

the key characteristics Commerce identifies provide substantial evidence in support of Commerce's interpretation of the relevant phrase.[13]

    More importantly, Commerce's contention that because the PRC Nails Order includes nails that have different physical characteristics, the phrase "nails . . . constructed of two or more pieces" must mean that the additional pieces can be physically different from the nail component, see Remand Results at 8–9, is unpersuasive. The fact that the PRC Nails Order broadly defines the properties of a nail provides no guidance on how the court is to evaluate whether a product is a nail "constructed of two or more pieces" or what properties the "additional pieces" can possess. Commerce's contention, likewise, provides no meaningful explanation for

─────────────

Cir. 2009) (the court must be able to reasonably discern the path of an agency's decision). Furthermore, to the extent that Commerce continues to rely on the fact that the ITC Report provides a masonry anchor as an example when discussing nails produced of two or more pieces, see Remand Results at 13, such reliance is not helpful because the words of the PRC Nails Order do not clarify which of the products listed in the ITC Report the order encompasses. See Midwest Fastener Corp., 42 CIT at __, 348 F. Supp. 3d at 1302 n.5.

[13] Commerce's invocation of Mid Continent Nail Corp. v. United States, 725 F.3d 1295 (Fed. Cir. 2013) ("Mid Continent Nail") is unpersuasive. Remand Results at 9–10 (arguing that it must "examine the 'literal terms' of the order to determine whether a component of a 'mixed-media' product is within the scope of an order when it is combined with non-subject components." (citing Mid Continent Nail, 725 F.3d at 1302, 1304)). The product at issue in Mid Continent Nail was unambiguously covered by the scope of the order and the scope inquiry resolved whether the product, when packaged with other non-subject merchandise in a tool kit, took it out of scope. See Mid Continent Nail, 725 F.3d at 1298. By contrast, a plain reading of the PRC Nails Order does not reveal which products qualify as nails "constructed of two or more pieces" and there is no suggestion, either from Commerce or the record, that Midwest's strike pin anchors are part of a "mixed-media" product. See Remand Results at 20–21 (noting that a "'mixed-media' analysis is not necessary in this case"); see also id. at 14, 20 (noting that the "outer-body anchor is permanently affixed to the nail piece").

Court No. 17-00231                                                                 Page 17

why a multi-component product is within the scope of the <u>PRC Nails Order</u> if just one

of its components is a nail.  <u>See</u> <u>Remand Results</u> at 10.

      Commerce's (k)(2) analysis also fails to support its determination.  Specifically,

Commerce found that physical characteristics of the product were similar because the

pin in the strike pin anchor would be considered a nail if it were imported by itself.

<u>Remand Results</u> at 12; <u>see also</u> 19 C.F.R. § 351.225(k)(2)(i).  Commerce therefore

compares the physical characteristics of one part of the strike pin anchor to nails.

<u>Remand Results</u> at 14–15.  Commerce's comparison ignores the language of 19 C.F.R.

§ 351.225(k)(2) which calls for the comparison of the physical characteristics of the

product, not the physical characteristics of part of the product.  If Commerce were to

compare the physical characteristics of the product it must consider not only the pin,

but also the anchor body, the hex nut and the flat washer.  It should also consider

how those physical characteristics function.  Comparison of physical characteristics

logically includes a comparison of the function of those characteristics.  Commerce

must address record evidence that demonstrates it is the anchor body of the strike

pin anchor, not the pin, that provides the fastening function.  <u>See</u> Pl.'s Scope Ruling

Req. at 8.

      As for the expectations of the ultimate purchasers, Commerce contends that

those expectations vary.  <u>Remand Results</u> at 15; <u>see also</u> 19 C.F.R. § 351.225(k)(2)(ii).

Commerce emphasizes, however, that purchasers expect to hit a nail with a hammer

to fasten one object to another.  <u>Remand Results</u> at 16.  Although purchasers will

expect to hammer the strike pin anchor at some point, strike pin anchor purchasers

Court No. 17-00231                                                        Page 18

must also expect to drill holes into masonry, align holes, insert anchors and tighten nuts. See Pl.'s Scope Ruling Req. at 3, 9; see also Final Scope Ruling at 5; Remand Results at 4; Def.'s Reply to Cmts. at 3. Commerce does not address these expectations. Commerce does not address record evidence that the ultimate product use for strike pin anchors at issue here is specific. See Pl.'s Scope Ruling Req. at 9. They are used to fasten objects to masonry. Id. ("Strike Pin Anchors are used to fasten an object to a masonry wall, floor or ceiling."); see also Midwest's (k)(2) Cmts. at 2; Mid Continent's (k)(2) Cmts. at 4, 7, 9. Also, the ultimate use involves the expansion of the anchor to fasten rather than the simple fastening of a nail. Id.

Commerce also appears to have ignored evidence that strike pin anchors are advertised and marketed differently than nails. See Remand Results at 18–19 (concluding that strike pin anchors and nails are advertised in a similar manner because record evidence demonstrates that both can be advertised online); but see Midwest's (k)(2) Cmts. at 4–5, Exs. 3, 4 (demonstrating that although anchors and nails "fall within the general fastener category in the hardware section of retail outlets[,]" "anchors are typically treated as separate and distinct articles of commerce by fastener distributors and retailers.").

Commerce's proposal to instruct CBP that only the pin component of Midwest's strike pin anchor, and no other components, is dutiable under the PRC Nails Order, see Remand Results at 10–11, highlights the flaw in Commerce's reasoning. Commerce explains that it "may instruct CBP to assess duties on only a portion of a unitary, assembled article[.]" See Remand Results at 22–23 & n.77 (citing CBP

Clarification – Correct Use of the ADD/CVD Special Value Fields, Multiple Entry

Line and Set Provisions, CSMS #18-000379 (June 6, 2018) available at

https://csms.cbp.gov/docs/23578_922344688/Special_Value_Memo_Attachment.pdf

last visited Feb. 28, 2020) ("CBP Clarification")).  The CBP Clarification, however,

provides no support for the proposition that Commerce can identify a component in a

distinct unitary article and apply an antidumping duty to that component.  To the

contrary, the CBP Clarification explains how to account for ADD on the entry

summary when the scope of an order includes components of a product. CBP

Clarification, Example 1.  The scope of the order in this case does not reach nails

included within other products.    The scope reaches nails, whether one piece, or

constructed of two or more pieces. Either the entire strike pin anchor is a nail, or it

is not.

## CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Commerce's remand redetermination is further remanded for

reconsideration consistent with this opinion; and it is further

**ORDERED** that Commerce shall file its remand redetermination with the

court within 90 days of this date; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments on

the remand redetermination; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file their replies

to comments on the remand redetermination; and it is further

Court No. 17-00231                                                      Page 20

      **ORDERED** that the parties shall have 14 days thereafter to file the Joint

Appendix; and it is further

      **ORDERED** that Commerce shall file the administrative record within 14 days

of the date of filing of its remand redetermination.


                          /s/ Claire R. Kelly
                        Claire R. Kelly, Judge

Dated:        March 4, 2020
               New York, New York